IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>Approximately 400,046.80 USDT<br><br>Defendant *in Rem.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION NO.: |

**<u>UNITED STATES' VERIFIED COMPLAINT FOR FORFEITURE *IN REM*</u>**

The Plaintiff, United States of America, brings this complaint and alleges as follows, in accordance with Rule G(2) of the Supplemental Rules for Admiralty and Maritime Claims and Asset Forfeiture Actions.

**<u>NATURE OF THE ACTION</u>**

1. This is a civil action *in rem* to forfeit to the United States of America property equivalent to the amount of 400,046.80 USDT Tether Cryptocurrency, valued at approximately $399,466.30 USD ("United States Dollars")[1], (hereinafter "Defendant Funds"), pursuant to 18 U.S.C. § 981(b), 18 U.S.C 981(a)(1)(A) and 18 U.S.C. § 981(a)(1)(C). The United States seeks forfeiture based upon a reasonable belief that the Government will be able to meet its burden of proof at trial to show that the Defendant Funds constitute, or are traceable to:

1 Calculated on June 24, 2026, using https://www.coinbase.com/converter/usdt/usd.

a. property involved in wire fraud transactions or attempted wire fraud transactions in violation of 18 U.S.C. §§ 1343, 1349 and/or conspiracy to commit same;

b. property involved in money laundering transactions or attempted transactions in violation of 18 U.S.C. § 1956(a)(1)(A)(i), and/or § 1956(a)(1)(B)(i) and/or 1957;

c. property involved in an illegal money transmitting business, in violation of 18 U.S.C. § 1960; and/or

d. proceeds of some other form of specified illegal activity set forth in 18 U.S.C. § 1956(c)(7) and;

e. proceeds of some other form of specified illegal activity set forth in 18 U.S.C. § 1956(h) and;

f. property involved in money transactions in criminally derived property or attempted money transactions, in violation of 18 U.S.C. § 1957.

**JURISDICTION AND VENUE**

2. This Court has subject matter jurisdiction over an action commenced by the United States pursuant to 28 U.S.C. § 1345, and over an action for forfeiture by virtue of 28 U.S.C. § 1355. This Court has *in rem* jurisdiction over the Defendant Funds pursuant to:

a. 28 U.S.C. § 1355(b)(1)(A), because acts or omissions giving rise to the forfeiture occurred in the District of South Carolina; and

b. 28 U.S.C. § 1355(b)(1)(B), because venue properly lies in this district pursuant to 28 U.S.C. § 1395.

## THE DEFENDANT *IN REM*

3. The Defendant Funds consist of approximately 400,046.80 USDT Tether Cryptocurrency seized by the FBI on or about April 1, 2026. The Defendant Funds are associated with the four Subject Addresses.[2]

4. In accordance with the provisions of 19 U.S.C. § 1606, the Defendant Funds have a total domestic value of approximately $399,466.30 USD.

## KNOWN POTENTIAL CLAIMANTS

5. There are no known individuals whose interests will be affected by this litigation, as the holders of the Subject Addresses have not been identified by Tether or the FBI. General publication will be made as to the Defendant Funds via advertisement on www.forfeiture.gov.

## BACKGROUND ON SCAMS RELATING TO CRYPTOCURRENCY

6. Cryptocurrency confidence scams or "pig butchering" are common online schemes. Fraudsters contact random telephone numbers via text message, engage in conversation, and ultimately steer the conversation toward trading cryptocurrency. The victims believe

2 Frozen Wallet 1 (TPkWKTTUQja8irdJjCUm8bx1icshU17eZN),
Frozen Wallet 2 (TFfLx7wWa2L1apG2zvYa6oJFHYvprxgCyF),
Frozen Wallet 3 (THAbjPG3idM7U4JcnX7Bj9MsZhzPhN8eY9),
Frozen Wallet 4 (TWs3D8jzQf5xPynAXiafVXqddS8rzPwqgr) (collectively, the "Subject Addresses")

they are engaged in cryptocurrency investing but the money is being deposited into the fraudster's cryptocurrency "wallet." These funds are then typically sent via cryptocurrency pass-through wallets to attempt to avoid law enforcement seizure.

**BASIS FOR FORFEITURE**

7. Pursuant to the pleading requirements of Supplemental Rule G(2)(f), Plaintiff alleges that there is a factual basis to support a reasonable belief that the Government will be able to meet its burden of proof at trial to show that the Defendant Funds are subject to forfeiture to the United States. The facts set forth below, including detailed funds tracking data, indicate that the Subject Addresses were used by scammers to receive and launder proceeds from victim 1, a resident of Inman, S.C., through a "pig butchering" scheme. The facts of the case are as follows.

8. Prior to June 9, 2025, victim 1, a resident of Inman, S.C. was approached online by an individual who purported to have texted the wrong number, then engaged in conversation with victim1, and ultimately led the discussion towards trading cryptocurrency. Victim 1 subsequently signed up for a trading account at coingatepro.com. Additionally, in order to fund this trading account, Victim 1 opened an account at Coinbase, a large U.S. based cryptocurrency exchange.

9. Starting on June 9, 2025, and continuing until July 25, 2025, Victim 1 transferred funds to his trading account and engaged in what he thought was cryptocurrency trading. Over time, Victim 1 believed he was making money, and he attempted to withdraw funds. At this point, the fraudster requested that he deposit additional funds to verify the trading

account. After doing so, Victim 1 again tried to withdraw funds. Victim 1 received notification that he had successfully withdrawn funds to the Coinbase account; however, Coinbase support informed Victim 1 that the notification was fake and the funds had not been deposited into his account.

10. On July 25, 2025, Victim 1 reported the theft and law enforcement provided with this information. Using cryptocurrency tracing techniques, law enforcement traced the transfers out of Victim1's Coinbase account. The tracing of transfers is described and incorporated herein and graphically set forth in Attachment A, incorporated herein:

a. Victim 1's Coinbase account sent six transactions to an un-hosted wallet totaling 493,181.07573 USDT from June 9, 2025 until July 25, 2025.

b. From the un-hosted wallet**,** the stolen USDT was transferred through a series of wallets in a non-linear manner. This is a common technique employed by money launderers to obfuscate the source and destination of funds. This involves transferring funds in smaller or larger portions than received through several layered wallets.

c. From a layered wallet, the stolen funds were moved in fourteen transactions to a chain swapping service that facilitates the cross-chain swapping of cryptocurrencies. The service provider details show that the user then converted the funds from the ETH to the TRON blockchain, and transferred the funds to another un-hosted wallet.

d. From un-hosted wallet the funds moved through more layered wallets to the final Subject Addresses held as Tether.

12. The stolen funds were then held as USDT (Tether) on the TRON blockchain. On or about March 26, 2026, the FBI obtained a federal seizure warrant for the Subject Addresses and served it on Tether. Tether "burned" (i.e. destroyed) the USDT associated with the addresses at issue, and Tether reissued and transferred the equivalent amount of USDT tokens associated with the Subject Addresses to a government controlled wallet. The FBI received the associated Defendant Funds on or about April 1, 2026.

13. Based on the above, the Government will be able to meet its burden of proof at trial to show that the Defendant Funds constitute, or are traceable to:

a. property involved in wire fraud transactions or attempted wire fraud transactions in violation of 18 U.S.C. §§ 1343, 1349 and/or conspiracy to commit same;

b. property involved in money laundering transactions or attempted transactions in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), and/or '1956(a)(1)(B)(i);

c. property involved in an illegal money transmitting business, in violation of 18 U.S.C. §1960;

d. proceeds of a money laundering conspiracy in violation of 18 U.S.C. § 1956(h) and;

e. property involved in money transactions in criminally derived property or attempted money transactions, in violation of 18 U.S.C. § 1957.

## CONCLUSION

14. Based upon these facts, and pursuant to 18 U.S.C. § 981(f) and 21 U.S.C. § 881(h), whereby the Plaintiff's right, title and interest in and to the Defendant Funds relates back to the commission of the act giving rise to the forfeiture, the Defendant Funds have become and are forfeited to the United States of America, to be disposed of pursuant to Supplemental Rule G(7)(c) for Admiralty or Maritime Claims and Asset Forfeiture Actions, 18 U.S.C. § 981(d), 21 U.S.C. § 881(e), and other applicable laws.

WHEREFORE, Plaintiff prays that due process issue to enforce the forfeiture of the Defendant Funds, *in rem*; that a Warrant for the Arrest of the Defendant Funds be issued; that due Notice be given to all interested persons to appear, make claim, answer and show cause why the forfeiture should not be decreed; that the Defendant Funds be decreed condemned and forfeited to the United States of America for disposition according to law; and that Plaintiff have such other and further relief as the Court may deem just and proper, together with the costs and disbursements of this action.

Respectfully submitted,

BRYAN P. STIRLING
UNITED STATES ATTORNEY

By: *s/Carrie Fisher Sherard*
Carrie Fisher Sherard #10134
Assistant United States Attorney

55 Beattie Place, Suite 700
Greenville, SC 29601
(864) 282-2100
Carrie.A.Fisher@usdoj.gov

August 6, 2026

**Appendix II: Cryptocurrency Terms**

1. Virtual currencies are digital tokens of value circulated over the Internet as substitutes for traditional fiat currency. Virtual currencies are not issued by any government or bank, like traditional fiat currencies such as the U.S. dollar but are generated and controlled through computer software.

2. Virtual currency addresses are the virtual locations to which such currencies are sent and received. A virtual currency address is analogous to a bank account number and is represented as a string of alphanumeric characters.

3. The identity of an address owner is generally anonymous (unless the owner opts to make the information publicly available), but analysis of the blockchain can often be used to identify the owner of a particular address. The analysis can also, in some instances, reveal additional addresses controlled by the same individual or entity.

4. Each virtual currency address is controlled through the use of a unique corresponding private key, a cryptographic equivalent of a password needed to access the address. Only the holder of an address's private key can authorize a transfer of virtual currency from that address to another address. A user of virtual currency can utilize multiple addresses at any given time.

5. A virtual currency wallet is a software application that interfaces with the virtual currency's specific blockchain and generates and stores a user's addresses and private keys. A virtual currency wallet also allows users to send and receive virtual currencies. Multiple addresses can be stored in a wallet.

6. Many virtual currencies publicly record all their transactions on what is referred to as the "blockchain." The blockchain is essentially a distributed public ledger, run by a decentralized network, containing an immutable and historical record of every transaction that has ever occurred utilizing that blockchain's specific technology. The blockchain can be updated multiple times per hour and record every virtual currency address that ever received that virtual currency. It also maintains records of every transaction and all the known balances for each virtual currency address. There are different blockchains for different types of virtual currencies.

7. Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. USDT is a stablecoin pegged to the U.S. dollar. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives. Tether Limited ("Tether") is the company that manages the smart contracts and the treasury (i.e., the funds held in reserve) for USDT tokens.